Argued and submitted December 11, 1985, reversed and remanded July 23, 1986

## HANSEN,
*Appellant,*

*v.*

## SINGMASTER INSURANCE AGENCY, INC.,
*Respondent.*

## (83-833-J-2; CA A35273)

722 P2d 1254

Ervin B. Hogan, Medford, argued the cause for appellant. With him on the brief was Michael Brian, Medford.

Thomas C. Howser, Ashland, argued the cause for respondent. On the brief were Judith H. Uherbelau and Cottle & Howser, P.C., Ashland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiff brought this action to recover the accelerated balance due under a contract, by the terms of which defendant agreed to redeem its stock from plaintiff. Defendant counterclaimed to recover payments it had made pursuant to that contract. The trial court granted defendant's motions for summary judgment on both the complaint and counterclaim and awarded attorney fees to defendant; judgment was entered accordingly. On appeal, plaintiff contends that genuine issues of material fact exist with respect to the enforceability of the redemption agreement and that, therefore, the trial court erred in granting defendant's motions. He also contends that the award of attorney fees was improper if the redemption agreement was illegal, as the trial court held.

Defendant is a closely held corporation engaged in the sale of insurance. On July 1, 1981, plaintiff, then president and 40 percent shareholder of defendant, entered into an agreement under which defendant agreed to purchase all of plaintiff's stock in defendant. The agreement was signed by plaintiff and defendant's only remaining stockholders, Thomas Kennedy, who is defendant's current president, and Ronald Cory. The total purchase price was $211,000. Eleven thousand dollars was credited against the amount owing to defendant from plaintiff on a preexisting debt. Thirty thousand dollars was paid "upon execution."[1] The balance of $170,000 was to be paid in annual installments of $17,000, with the first installment due on July 1, 1982. Interest on the unpaid balance was 10 percent until June 30, 1986, and 2 percent below the prime rate charged by a local bank thereafter. Interest was to be paid in monthly installments of $1,000 plus an annual lump sum payment in the amount of any unpaid balance. The lump sum payments were due on the same day as were payments on the principal. The agreement provided that, if defendant did not have sufficient surplus out of which to make payments as they became due, then it would "promptly take all required action to enable it to make such payment out of surplus, including * * * a reappraisal of [its] assets to reflect the market value of [its] assets * * * in the event such market value exceeds the book value thereof."

---

[1] Defendant borrowed the money for the down payment from U.S. National Bank.

Defendant made the first ten monthly interest payments as required by the contract. However, it failed to make the installment payment on the principal and the lump sum interest payment that were due on July 1, 1982, and has defaulted on all successive payments. Plaintiff notified defendant of his intent to accelerate the balance due in accordance with a provision of the agreement and then commenced this action. Defendant raised the affirmative defense of illegality, arguing successfully to the trial court that the agreement violated the provisions of ORS 57.035 and was, therefore, void and unenforceable.

■ ORS 57.035(1) provides that corporations have the right to purchase their own shares, but

"only to the extent of unreserved and unrestricted earned surplus available therefor, and, if the articles of incorporation so permit, or with the affirmative vote of the holders of at least a majority of all shares entitled to vote thereon, to the extent of unreserved and unrestricted capital surplus available therefor."

Defendant contends that, because there was no formal shareholder meeting to approve the agreement, only earned surplus, which plaintiff concedes was insufficient, may be considered in determining whether it had sufficient available surplus. It also contends that, even if capital surplus may also be considered, it, too, was insufficient. Plaintiff argues that defendant's capital surplus may be considered, because all three of its shareholders signed the redemption agreement, and assigns as error the trial court's failure to consider the market value of defendant's expirations in valuing defendant's capital surplus. He argues that defendant's capital surplus was sufficient to comply with the surplus requirement if the fair market value of those expirations is considered.

ORS 57.791 provides that any action required to be taken at a shareholders' meeting may be taken without a meeting if all of the corporation's shareholders consent in writing to the action. Here, the shareholders' signatures constitute their written, unanimous consent to the agreement. Accordingly, we hold that defendant's capital surplus may be considered in determining the adequacy of its available surplus.

Expirations, in the insurance business, represent the value attached to client files based on the future income

expected to be generated by the continuing patronage of those clients. In an affidavit submitted in opposition to defendant's motions, plaintiff stated that the market value of defendant's expirations on the date of the purchase was $600,000. Defendant argues that expirations should not be considered in computing capital surplus but that, if they are, the amortized book value provides the appropriate measure of their worth. It also asserts that plaintiff's assessment of the market value of its expirations is inflated. The value attributed to expirations on the corporate balance sheet for June 30, 1981, was $5,700.

■■ We see no reason to exclude from the determination of available capital surplus the value of any marketable corporate assets, including the value of marketable intangibles such as expirations, and no reason to base the valuation solely on the corporation's financial statements, which may not be an accurate statement of its financial condition for all purposes, rather than on actual market values if they are reasonably ascertainable. *See Baxter v. Lancer Industries, Inc.,* 213 F Supp 92 (ED NY 1963). The redemption agreement required defendant to reappraise the corporate assets to reflect the market value if defendant, on the due date of any installment, did not have sufficient surplus out of which to make the payment, and we are not aware of any law that prohibits that provision. Accordingly, we conclude that the market value of defendant's expirations on the date of the purchase, with respect to which a genuine issue of fact exists, may be considered in determining the adequacy of available surplus. Until that is resolved, the question of whether the agreement was unlawful at the time it was executed cannot be determined.

■ Defendant contends that, even if there is a genuine question of fact regarding the adequacy of available surplus, the purchase rendered the corporation insolvent at some time after the agreement was signed and was, therefore, illegal under ORS 57.035(5). ORS 57.035(5), at the time of the agreement and when the first installment became due, prohibited a corporation from making purchases or payments for its own shares at a time when the corporation was insolvent or when such purchase or payment would make it insolvent.[2] A

---

[2] At the time the parties entered into the agreement, ORS 57.035(5) provided that

corporation is "insolvent" when it is unable to "pay its debts as they become due in the usual course of the business." ORS 57.004(8). If the corporation is insolvent at the time the agreement to redeem is made, the agreement is illegal and unenforceable. *Field v. Haupert,* 58 Or App 117, 647 P2d 592 (1982). However, that is not this case.

■ Defendant relies on an affidavit submitted in support of its motion, in which its president (Kennedy) stated that

"as a result of entering into the redemption agreement, Singmaster Insurance became insolvent in that it became impossible for the corporation to make the payments due plaintiff and U. S. National Bank while still meeting all of its other financial obligations and expenses * * *."

That statement is not only conclusory, it does not say *when* defendant became insolvent. Assuming that, after defendant had made 10 payments under the redemption agreement, paying the next installment would make the corporation insolvent, then that payment may not be made. However, the fact of insolvency at some time after the agreement is partly performed would not render the agreement illegal *ab initio*; it would mean that it could not be enforced unless and until the corporation became able to make payments without becoming insolvent.

Defendant apparently contends that, although it was not insolvent on the date of the agreement, its performance of the agreement would make it insolvent. The evidence in support of its motion, however, does not show that the only reasonable conclusion that may be drawn from its financial status on the date of execution is that making the contract payments would, in time, render it insolvent. Evidence that the corporation did become insolvent later is not sufficient. Therefore, defendant has not met its burden of showing that there is no genuine issue of material fact regarding whether its performance of the redemption agreement would make it insolvent.

---

"no purchase of *or payment for* its own shares shall be made at a time when the corporation is insolvent or when such purchase *or payment* would make it insolvent."

The references to "payment" were deleted in 1983. Or Laws 1983, ch 611, § 2.

■ Turning to whether defendant's motion for summary judgment was properly granted, not because the agreement was illegal *ab initio,* as the trial court held, but because it would have been illegal for defendant to have made the payment due on July 1, 1982, and those due thereafter. In other words, plaintiff may not be able to recover anything if requiring defendant to make any of those payments would violate ORS 57.035(5). However, Kennedy's affidavit dated May 26, 1983, along with the other evidence submitted to the trial court, is insufficient to show that defendant was insolvent on July 1, 1982, or that making those specific payments would render it insolvent. Defendant admits that it made the first ten interest payments as they became due. There is no evidence that it failed to pay all of its debts during that time or that it could not make the payments due July 1, 1982, in the usual course of its business, except for Kennedy's conclusory statement that was not specific as to the time when defendant became insolvent. Defendant's balance sheet as of June 30, 1982, shows cash on hand in the sum of $22,327, which was apparently enough to make the payment due plaintiff on July 1, and also shows current notes receivable from its officers in the amount of $43,000. Accordingly, there is a genuine issue of material fact with respect to whether defendant was insolvent on the date when the payments were due or whether making the payments would have rendered it insolvent.

■ The trial court erred in granting defendant's motions for summary judgment on plaintiff's complaint and its similar motion on its counterclaim. The award of attorney fees falls with the judgment for defendant.[3]

Reversed and remanded.

---

[3] Plaintiff contends that, because the statutory prohibitions here involved are for the protection of the shareholders and creditors, and because the shareholders consented to the agreement and no creditors were objecting, defendant should be estopped from raising the defense of illegality. It seems apparent that it would be contrary to public policy to enforce an illegal contract. The contention is without merit.